Tilghman C. J.
The defendant signed a positive writ-
ten promise to pay fifty dollars, “in such manner, and proportions, and at such times, as shall be determined by The President and Managers, in pursuance of the said Act of Assembly.” It is to be observed, that at the time of subscription, there were no President and Managers in existence. —-there was no body corporate in existence. But, when fifty persons, or more, should have .subscribed two hundred shares of the stock, the commissioners were to certify, under, their hands and seals, the names of the subscribers, and the number of shares, subscribed by each, to the Governor, and thereupon the Governor was authorised, by letters patent, under his hand, and the seal of the Commonwealth, to erect the subscribers, and those who should afterwards subscribe, into a body politic and corporate, &c.1 According to the letter of the promise signed by the defendant; the times, manner, and proportion of paying the whole fifty dollars, were to be determined by The President and Managers, after the Company should be incorporated and organised. But it would be impossible for The President and Managers, to order the *222 payment of this sum of five dollars, at a time previous to their existence. Therefore, the payment of the money now demanded, cannot be brought literally within the words of the promise. But, if that were the only difficulty, I would strive hard to surmount it; because, the defendant did promise to pay to the corporation, the sum of fifty dollars in the whole, and to make up fifty, we must include the five now in dispute. It appears, however, that the objection to the action stands upon stronger ground, and the question really is, whether the plaintiffs can support their action, without a substantial violation of the law, from which they derive their existence. A corporation, being the mere creature of law, can act in no other manner than the law prescribes, and mu3tnot be permitted to enter into a contest with the Legislature, concerning the policy, or expediency of the terms which have been dictated. Let us endeavour to ascertain, then, what was the real intention of the Legislature. Having appointed the commissioners, and directed the form in which the subscriptions should be made, and the manner of opening the books, and receiving subscriptions, the Act contains the following proviso : “ Provided always, that every person offering to subscribe in the said books, in his own, or any other name, shall previously pay to the attending commissioners, the sum of five dollars, for each and every share to be subsribed, out of which, shall be defrayed, the expense attending the taking such subscription, and other incidental charges, and the.remainder shall be paid over to the treasurer of the corporation, as soon as the same shall be organised and the officers chosen, as herein after mentioned.” Words more strong, and an intention more clearly expressed, to make the payment of five áollars, a condition precedent to the subscription, cannot be conceived. By what authority, then, could the commissioners, or the corporation, dispense with this condition ? It is answered, by the counsel for the plaintiffs, that the object of the condition, being only to procure a fund for defraying the expenses of taking the subscriptions, and other incidental charges, if the commissioners would take the responsibility of these expenses on themselves, the object of the law would be attained, and it would be unnecessary to exact the previous payment. But there are several objections to this answer. In the first place, the commissioners, instead *223 of obeying the law, set themselves above it, and undertake to amend it; and in the next, it has not been shewn, that the procuring money for defraying the expenses which have been mentioned, was the sole object of,the proviso. Indeed, it is impossible, that it could have been ; because the payment of five dollars upon each of two hundred shares, (the number necessary to be certified, before the Governor could grant a charter,) would give 1000 dollars, a sum much larger than could be necessary for these expenses. Besides, there never hu1- been, or certainly never ought to have been, a corporation created, with a view solely to the private interest of the corporators. Public good, and private emolument, are supposed to go hand in hand. Where a turnpike road is the object, it is inconceivable that the Legislature would burthen the people with a toll, merely to fill the pockets of the Company. One great, object is, to have the road carried in the most convenient direction from one point to another. I mean, a direction the most convenient to the public, and not to a few individuals, who may wish to have a road through their own grounds, or before their own doors. Now, the direction of the road, w.ill depend much on the character of the managers, who are to be chosen by the subscribers. And if persons are permitted to subscribe, without the previous payment of five dollars a share, large subscriptions may be made, which could not otherwise have been made, by those who are anxious to give a direction to the road, which may benefit themselves, at the expense of the public. But, this is not all. There has prevailed among us, to an unfortunate degree, a pestilent spirit of speculation, which has induced some, without means of payment, to subscribe to , projects of all kinds, with a hope of selling out to advantage, as soon as the stock has risen. These speculative subscriptions have many bad consequences, and there is no way so effectual to check them, as to insist on a moderate payment, at the time of subscribing. So that, although, I do not think myself at liberty to ask, why the Legislature should have adopted a certain policy, when I see the intent clearly expressed, yet, were I to permit myself to ask it in the present instance, I could be at no loss to find reasons for this proviso, other than raising money to defray the expenses of taking the subscriptions, See. Assuming then, that it was the intent of the law, that no subscrip *224 tion should be received, without a previous payment of five dollars a share, the case will be reduced to this simple question : can a contract be enforced in a Court of Justice, which was made in violation of an Act of Assembly ? It is not the. first time this question has been asked in this Court, and it has received but one answer. The contract cannot be enforced. I refer to the cases of Mitchell v. Smith, 1 Binn. 110, and Maybin and others, executors of Anthony v. Coulon, 4 Dall. 298, where the point was fully argued, held by the Court long under advisement, and then unanimously decided. Ever since, the law has been taken as settled. I consider the contract in this case then, as void, ab initio. The commissioners had no right to receive the subscription, or the corporation to ratify it. It was flying in the face of the law, under which they drew their breath, A case of this kind has occurred in the State of New York, but not so strong as the present, in which the law has been settled, that where the Act of Incorporation directs, that a certain sum shall be paid at the time of subscribing, the direction must be complied with, or the contract is void. I allude to the case of the Union Turnpike Company v. Jenkins, 1 Caines' Rep. 381, and 1 Caines' Cas. in Er. 86. The New York Case is not expressed with a proviso, and in those strong and pointed terms, which are to be found in our Act of Assembly. The Supreme Court held the contract good-, but their judgment was reversed in the Court of Errors, and the law is now settled, according to that reversal, as appears bv the cases of The Goshen Turnpike Company v. Hurtin, 2 Johns. 217, and The Highland Turnpike Company v. M'Kean, 11 Johns. 98. The decision of the Supreme Court, whose authority is great, was not unanimous ; and I cannot help supposing, that they have acquiesced with sincerity, in the opinion of the Court of Errors. I would willingly have supported this action, if possible; because it is with an ill grace, that a man puts his hand to a contract, by which he expects to be benefitted, and after-wards refuses to comply with it. But, it has struck me in one strong point of view, on which I cannot shut my eyes. The subscription was taken in direct opposition to the Act of Assembly. — It was void, therefore, and the judgment of the Court of Common Pleas, which declared it void, should be affirmed.
*225 I think proper to add, however, in order to avoid misconstruction, that I must not be .understood, as making any insinuations against the validity of the charter of this Company. After all that has passed, there are many considerations in favour of the charter, ’ which are not applicable to the question on which I have given my opinion.
Gibson J.
The commissioners were ministerial officers, acting under a limited authority which they were strictly bound to pursue; and the Act is positive that a deposit of five dollars on the share, was to be a condition precedent. The permission to subscribe without the deposit, was therefore a breach of duty ; and the contract was illegal. But it is said, the Company to be formed was the only party intended to be benefitted, and that it might waive the provision thus introduced in its favour, and ratify the proceedings of the commissioners, who are said to have been exclusively its agents. But were the Company, in fact, the only perspns interested in the execution of this provision ? It seems to me, that not only the public at large, but various individuals, had an interest distinct from that of the Company, the members of which were, perhaps, less concerned than any other party. What was the consideration for the charter ? Undoubtedly the benefit that was expected to result to the public j not the profit that might be made by th© stockholders.' The State therefore was a party, and had an interest in preventing the scheme from being turned into a bubble, and the enterprise from failing, perhaps when half effected, and after considerable injury should be done to the owners of the soil, whom she was bound to protect from unnecessary damage. She had also an interest in having the road laid out to the best advantage, and in preventing those who should be intrusted with that office, from sacrificing public utility to individual interest and influence ; and to secure this, it was absolutely necessary that the commissioners should be prevented from setting up mere men of straw as electors of the managers and officers of the Company. The inhabitants on the contemplated'route, had an interest in having the road located without partiality to individuals, and with as little damage to private property, as a due attention to the interest of the public should permit. *226 The-fair subscriber also, who paid his money according to t{le requisition of the law, had an interest, which was distinct from that of the corporation, in preventing those who came in by a fraud on the law, from being admitted to an eqUal participation in the administration of the corporate, affairs : And any person who may have thought the stock profitable, was interested in having the shares taken up in the way affording least facility to their being engrossed by the favourites of the commissioners. To secure these objects, the Legislature had a right to take their own measures to exclude all influence that was was not founded on a- permanent bona fide interest in the fund and project of the Company ; and to exact a previous pledge from each subscriber, that he was not only actually interested, but of ability to contribute his proportion of the expense. There is no reason to believe the object of the proviso was to provide a. fund for the expense incurred in taking subscriptions; for it never could have been supposed that a tenth part of the capital stock might be sunk in taking a preparatory step. The exaction of a deposit, is a provision which pervades the Turnpike Acts, not only of this State, but of most others ; and in many instances, the rate of the sum to be collected is very considerable. In the case before us, it surely never was supposed that a thousand dollars could be necessarily expended in procuring subscriptions for two hundred shares. The Legislature therefore had in view something beyond the expenses of the commissioners. The design was to prevent the subscription list from being filled with the names of nominal stockholders, and the creatures of others. In some corporations of this sort, it is within my own knowledge, that a very mischievous influence, which I have heard aptly denominated “ the sign post influence,” has been acquired by a few stockholders in this way. Then if the commissioners have proceeded illegally, how can the Company ratify their proceedings at the expense of interests with which it has no concern? The commissioners were the agents, not of the Company, but of the public. Their office was a trust to be executed for the benefit of the public, and such individuals as might in any way be affected by their acts or the acts of the Company. They acted under special instructions, not from the Company, but the Legis *227 lature, which were given with a view to protect interests which existed not only in the individuals who were to compose the Company about to be formed, but in the public, and in individuals, peculiarly affected. These instructions were a part of the compact between the Company and the State, and are as much binding on the Company as any. other clause in the Act of Incorporation. By what right, then, can it sanction a violation of them ? If the Legislature think proper to establish particular conditions or qualifications as to membership, the commissioners and the Company are bound to observe them. The Legislature had a right to say the patent should be withheld, till all, or any portion, of the stock should be paid in ; and if a fraud on the public, in granting the certificate, can be cured by the very Company thus illegitimately brought into existence, the law may be openly evaded, and a charter obtained against the declared will of the Legislature. The existence of a corporation, not constituted according to all the provisions of the Act of Incorporation, is a fraud on the public ; and I really do not see how a power to dispense with any particular provision, can be supposed to be lodged with the body itself, thus illegally formed. I do not say this Company has fraudulently come into existence, or that its charter would be void, if it had ; all I say is, that permitting the defendant to subscribe against the express directions of the Act, was a breach of duty which renders the contract illegal, and that he can set up the illegality as a defence.
Beside being illegal, the contraot was void for want of a consideration. Every contract, where the consideration is promise for promise, must be obligatory on both parties, or both will be at liberty to recede ; and the promise which is the consideration of that on which the action is brought, must be such as the plaintiff had power by law to perform.* I do not say there was án express promise here that the defendant should enjoy the rights and privileges of a corporator ; but certainly that was understood as being the consideration on which he subscribed. But the Company could introduce no one, as a member, in any other way than that pointed out in the Act of Incorporation; and even if they could, it would be requisite, that the defendant’s title should have *228 been good, when he subscribed; otherwise the contract woujcj [,e without mutuality; and if he acquired no right w^ich he could enforce against the will of the plaintiffs, he incurred no responsibility.
jt js unnecessary to say much about The Union Turnpike v. Jenkins, 1 Caines’s Rep. 381, decided by the Supreme Court of New-Tork. That decision, as a case in point, is, to say the least, rendered neutral by the reversal of the judgment in the Court for the correction of errors, 1 Caines’s Cases in Error, 86; and I really cannot discover any intrinsic claim to consideration, in the reasoning of the Judge who delivered the opinion of the majority of the Supreme Court. The illegality of the contract seems not to have been adverted to, except by the Chief Justice who dissented ; but the commissioners were considered as agents, who had a discretionary power to exact payment or to give security, and chose the latter; whereas the assumption of a discretionary power was in direct violation of the terms of the Act. The defendant had not, as was supposed, a right to pay up the instalment due at the time of subscribing, and demand performance of the contract. An attempt to acquire an interest in the stock, by colluding with the commissioners to evade the express injunctions of the law, would be a fraud on the public;.and, being particeps criminis, that would preclude him. The contract therefore was not mutual. I think it unnecessary to attempt a distinction between the Act for incorporating The Union Turnpike, by which payment of a part of the stock was to be cotemporaneous with the act of subscribing, and the law more immediately undetf consideration, by which payment was made a condition precedent. In either case, the Legislature having required that a certain portion of the stock should be paid in at the time, of subscribing, all attempt to defeat their intention was equally unlawful, without regard to the terms in which it was expressed. From the weight of this decision, therefore, notwithstanding the acknowledged respectability of the Court, I take the' argument to be entirely relieved.
I concur with the Chief Justice, that the judgment be affirmed.
Duncan J.
The letters patent by the Governor, fully incorporating the plaintiffs, whether they could afterwards *229 establish their right' of action or not, were competent evidence; —every thing was put in issue on the plea of non assumpsit. Before the corporation could take one step, it behoved it to prove a corporate capacity, and this only could be done by this public document. So was the written engagement of defendant; it was a note good on its face; it imported a consideration, and ought to have been received. But it would answer no valuable purpose to plaintiffs to reverse the judgment on this ground, if the opinion of the Court should be, that the subscription was so vicious that no action could be supported on it. The subscription book signed by the defendant and other subscribers of shares, proprietors of stock, was the original instrument on which the certificate of the number of shares and names of the subscribers, to the Governor was founded, and this certificate was all the law required to authorise the Governor to issue his letters patent. Had actual payment of any portion of the requisite number of shares been made a condition precedent to the issuing of the patent, as is required by the Act regulating banks, the question would have been different; but this is not required. The Act incorporating this Company provides, that where fifty persons or more shall have subscribed two hundred shares of the said stock, and the commissioners shall certify, under their hands and seals, the names of the subscribers and number of shares subscribed by each, it shall be lawful for the Governor, by letters under his hand and the seal of the Commonwealth, to create and erect the subscribers into one body politic and corporate, in deed and in law, by the name, style, and title of The President, Managers, and Company of the Hibernia Turnpike Road; whereas by the Bank Act, the Commissioners are required to certify, together with the names and sums subscribed, the amount actually paid. When these letters patent issued, the defen. dant became in fact and in law, a member of this corporation, subject to all the duties and entitled to all the rights and privileges of a corporator and stockholder ; and in this action, being an original stockholder, and the charter obtained at his instance, and on his subscription returned to the Governor, he cannot gainsay this, unless he negatives his subscription. This was a sufficient consideration for his promise. The contract, executed by the promisees, remained *230 no longer executory. Depending on mutual promises, the ¿lefenclant acquired a right to all he bargained for; his share in the profits of the contemplated road ; and in case he did ~ , . . * _ , , ,. not pertorm his promise, the Company had two remedies j to exact the forfeiture of his share and disfranchise him, or consider him a member, and bring their action, as well for the recovery of the calls of the Company, as for the sum he ought to have paid, on being admitted to subscribe. The subscription is in the very words prescribed; an absolute promise to pay the whole amount of the shares subscribed by him, including the five dollars on each share payable in advance. The commissioners had authority to receive it in this form. The objections are, that there was no consideration for the promise; and this is the only one that appears on the bill of exceptions, and another is now for the first time made, that the subscription was in fraud of the law. There were three parties to this contract; the general association, the State, and the subscriber. The consideration upon the part of the association was, their interest • in selling the stock, and increasing the number of subscribers, thus lightening the burden of each one; the interest of the public, in the public advantage of a turnpike road ; in each subscriber, an interest in the road and the expected profits of the stock. If he fulfils his promise, he is entitled to a certificate of stock, for the bringing of this action, is an election by the corporation not to forfeit, as they might have done, but to consider the obligation of the subscriber as subsisting, and while they demand payment, he has a right to his certificate. It is settled in this Court, 1 Binn. 70, in Massachusetts, 5 Mass. R. 235, and in New York, 9 Johns. 217, that the remedy by forfeiture of the shares, is not the only one, and that the Company may support an action on the promise against the subscriber. It is a very satisfactory answer, to that which appeared to me to be the only plausible argument on the part of the' defendant, that at the time of the promise, there was no corporate body with whom a contract could be made, to observe that the letters patent have relation back to the Act enabling the Governor to issue them ; for that Act. authorised the subscription to be made to The President, Managers, and Company of the Turnpike Road; so that for the purpose of receiving a subscription, it became an immediate corporation, though it was not autho *231 rised to do other corporate acts until the letters patent issued. The law requires no particular form of words to create a corporation. Thus authorising any body of men to do an act in a corporate name, creates them a corporation quoad that act. If this were not so, then the subscription, whether the five dollars were paid or not, could have no binding efficacy. So nugatory would be the written engagement, so idle and unmeaning all this solemn form and pompous shew of words prescribed by the Legislature, that no man would be bound by it. But this is far from being the case. The subscription is, what it imports to be, an obligatory promise. It was in substance, though not negotiable, not being made payable to order or bearer, a. promissory note, and might have been declared on as such. It has every quality of a promissory note ; it is payable in money, payable, absolutely, and without any contingency, and payable on demand. Goshen & Minisink Turnpike Company v. Hurtin, 9 Johns. 217. The note itself imported a consideration; it was in effect payable on demand, and prima facie it is to be intended that he became duly a stockholder. The contract was completed, the rights of both parties vested, the one to the stock, the other to the money subscribed. This very question was decided in the Supreme Court of New York. Union Turnpike Company v. Jenkins, Lewis C. J. dissenting, 1 Caines’ Rep. 381. The reasons of the majority of the Court are convincing, and did not receive any answer from the Chief Justice, who dissentedorfrom the Chancellor Lansing, or the Senator L‘Hommedieu, in the Court of Errors, where the judgment was reversed. 1 Caines’ Cas. in Err. 86. The Chancellor assumed the very matter in debate 5 did the body politic exist ? When the promise was made,1 there was none to contract with, therefore there could be no mutual promises. If this be so, the conclusion was right. But here, the Legislature, for the purpose of receiving this subscription, created the subscribers a corporation, giving them a corporate name and capacity ; for the subscription was not to be to natural beings, to the commissioners by name, but artificial beings, called into life, and a name given to them to this purpose — a body of men to whom a capacity is given to act, and a corporate name. Here were a corporate name and a corporate right given, whose existence never ceased, or was suspended as *232 to this power, and who never could have existed to any good effect without this power.
The letters patent did not first give life to the corporation, though it enlarged their sphere of action. Mr. L’Hommedieu, the only other member of the Court of Errors, who gave a public opinion, decided it on other grounds — grounds which have been given up by all the Courts in all the States, in which that question has been raised — that the only remedy of the Company was, by forfeiture of the shares, and this weighed much with Chief Justice Lewis. The decision of this Court of last resort, was binding on all the Courts of NewTork, but enough appears to satisfy us, that though the Supreme Court submitted to the authority, they never acknowledged the reasonableness of the decision, and there has been an evident struggle in that Court, which has been filled by a succession of very able and distinguished men, to bring out of its operation, every case that is not exactly the same — the same ad unguem, though the principles be the same ; as in The Goshen and Minisink Turnpike Company v. Hurtin, and though the Court said, that the case was decided on the principle of want of consideration, yet, afterwards, in The Highland Turnpike Company v. M'Kean, they say most truly, that it is a little difficult to ascertain the point on which the Court of Errors decided, for the only public opinions were for different reasons. On what grounds the silent votes were given, must be matter of mere conjecture ; and it is as probable a conjecture, that the judgment was reversed, for the reason assigned by the Senator, as for that assigned by the ChancelIpr. The weight of the opinion is in favour of the right. It is a just rule in the construction of Statutes, so to construe them, that no man that is free from injury or wrong, should by a literal construction, be punished or endamaged, ,1 Inst. 360. I would, therefore, if possible, avoid a construction, that would injure the fair and innocent subscribers, and if the case required it, would consider the proviso, as to previous payment, as directory; not, command of so positive and peremptory a nature, as to avoid all that had been done under the commission. Instances of the distinction between positive and prohibitory commands, and directory injuncdons, are not unfrequent. I give one. By an Act of Assembly, it is provided, “that every survey thereafter to be returned into the *233 land office, shall be made by actually going on, and measuring the land, and marking the lines, to be returned on the warrant into the land office, after the warrant authorising the survey, shall come into the hands of the surveyor, and every survey made theretofore, shall be accounted clandestine, and shall be void and of no effect.” It has been held by all Judges, and at all times, that though the directory part of the Act, as to marking every line of a survey, has not been strictly complied with, still the survey may be sufficient to entitle the warrantee to a patent, provided the surveyor has been on the ground, and run lines sufficient to identify the tract, and to ascertain the quantity; this being directory, an injunction on the officer. But the latter clause, as to the warrant being in the deputy’s hands, before he made the survey, being positive- and imperative, and in-the nature of an express prohibition, with a penalty annexed to disobedience, the survey shall be void, Woods v. Ingersoll and Dallas, 1 Binn. 146. This was the opinion of the present Chief Justice, and Justices Yeates and Smit; and Mr. Justice Brackenridge, in M'Rhea v. Plummer, 1 Binn. 227,acknowledges the distinction. He says, he “ will not say that any omission to go on the ground, and mark all the lines of a survey avoids it, as that part of the section may be directory ; yet if the survey is not made after the warrant comes to the hands of the surveyor, it is absolutely void, for that part of the section is positive; and such was the opinion of my brother Gibson, in the subsequent trial of Woods v. Ingersoll. The true reason I take to be this; that as it was the duty of the warrantee to deliver, his warrant into the hands of the deputy, before he proceeded to execute it, it was just that he should not profit by his own disobedience of the law ; whereas the execution of the warrant, by making the survey, was not his act, but the act of a public agent, over whom he had no control. So here, the subscriber having paid what the law required of him, had nothing to do with the payment of others, and he should not suffer for the neglect of a public officer, not of his appointment, and whose conduct he could not inspect or control. The prin,.* ciple is the same in both cases, that is, that an individual is not to suffer by the neglect of a duty required of a public officer, especially, where the neglect does not do any injury to, or prejudice the rights of others. If the Act had required *234 that the commissioners should take a prescribed oath, or give security, before they entered on the duties of their office, this, though a condition precedent, would not avoid their Acts — a condition of much more importance to the public, than the mere omission to receive five dollars, before they admitted one individual to subscribe. The evidence was not rejected on the ground of fraud. There was no evidence to infect the transaction with the taint of fraud ; the fraud consists in resisting the payment. This interpretation of the law will best promote the public good, and can do injury to no man; it will hold out no temptation to evade the laws, and violate the most solemn contracts — it will deter those from subscribing, who do not intend to pay, and will not encourage recourse to an unworthy subterfuge, which all men must reprobate» If this indulgence of the commissioners be criminal, punish them, but do not punish those subscribers who have complied with the law, by relieving those who have broken it, from the performance of their contracts. I cannot apply the, maxim, in pari delicto, melior est conditio possidentis to those who had no participation or knowledge of the imputed offence — no control over those by whom it is alleged to1 have been committed. They have gone on paying their money on the faith of a full and fair subscription, returned by the commissioners — returned by the public agents to the Governor, and confirmed by a public charter. If the conduct of the commissioners was faithless, they were not of their appointment; if the return was untrue, they were notinvolved in the guilt of its falsehood. But the return itself was true. The defendant was a subscriber, and if there was a conspiracy between the commissioners and some of the subscribers to evade the law, punish the conspirators; but in the name of justice, do not reward mala jide subscribers, by suffering them to withdraw from a losing contract and lay the burden on the innocent; for such is the effect, — the punishment of the bona jide and deceived subscribers, compelling them to make good the deficiencies of the delinquents, who make their own vio~ lation of the law, a justification of their breach of promise,■— giving them the chance of profit, and throwing the loss on their unoffending neighbours ; for the subscribers who have answered the calls of the Company, must not only go on to pay their own subscriptions, but take the shares of the delin *235 quents, or relinquish the undertaking altogether, and lose the money they have paid ; and by this harsh construction, while the subscribers are thus deprived of their rights, the public are deprived of the benefit of a good road — the moving consideration of the legislative grant. And why should all this be done ? It seems, because good policy and the purity of the laws demand this sacrifice. This is a policy I do not understand, — *a morality quite too refined to govern the affairs of this lower world. The consequence of affirming this judgment, is a dissolution of the corporation, (and let other turnpike companies look to it,) an opening of their gates, a depriving them of all retribution for what they have expended; and all this because one Mr. Henderson was permitted to subscribe without paying five dollars; for the argument is pushed to this extent; it cannot stop short of it. The omission of this payment on one solitary share, avoids the charter. No matter whether it has been subsequently paid, — paid the next day ; no matter that hundreds of thousands of dollars have been expended on the road ; no matter by whom the objection is made, or at what distant pexdod after the completion of the road, for time could not cure the fraud, and no contract that such a company would make, could be enforced, and no one could recover the amount of an obligation, where the consideration was a transfer of stock. The patent is void, because it is founded on a false suggestion j for if the letters patent are valid, the defendant is a legal member of the corporation, and is bound to pay; but if he is not bound to pay, it is because the consideration is not a legal one; and the consideration fails, because there is no legal corporation, and the defendant could not receive any possible benefit from his subscription; — a serious consequence to spring from so slight a cause. The commissioners may well be compared to agents authorised to sell for cash. They sell on credit, taking an obligation in the names of their principals. Could the purchaser be off, on the pretence, that the agent had no authority to sell on credit, when the principal assents to the contract and receives the bond ? It makes no difference, whether the agent was a public or private one, whether his authority was derived from a public law, or was conferred by an individual; for powers are as strictly construed as laws; an exact adherence to the letter, *236 is as much required in the one case as in the other ¡ the} are canecj the laws of the creator of the power; and he is considered as the legislator. The duty of these coenmissioners was that of mere agents; to sell the shares, to rece¡ve the five dollars on each share, to pay it over to the treasurer, and make return to the Governor. The Company, if they subsist as a corporation, could sue the commissioners for the payments to be made in advance. If this be so, and I know no principle on which it can be denied, it is an inevitable consequence, that the Company could sue the subscribers, because the written promise is to them. If this defendant had obtained the receipt of the commissioners, and had given his note to the Company for the money to be paid in advance, it could be recovered. Has he not done this? for the subscription includes this, and is a note for the five dollars, payable on demand ; and the Company could have recovered, though no note had been given for it. An omission, — a misconstruction of the law, — an abuse of the authority of an agent, either public or private, cannot be set up by the man who enters into the contract as a defence, and never can be treated as absolving him from the performance, when the contract is created for his benefit. If the defendant had revoked his subscription, not having paid the five dollars, before the contract had been completed by the letters patent, by which he is made a corporator, and by which he has acquired a corporate right and an individual interest, received the consideration, and become a party to the letters patent, it would have raised another question. But it is too late for him now to object to it. It is as repugnant to law, as it is to natural justice, and that good faith, which it is one great object and design of Courts of Justice to compel the observance of, to discharge this man from his contract, — . a contract which has for its basis a full consideration, and which now, for the first time, is attacked on the score of fraud ; for this doctrine is, on this argument, now for the first time, broached, that the contract was impure and such as a Court of Justice would not enforce. In all the cases in New York, where the question has arisen on subscriptions of this nature, the only objection was, the want of consideration, and not an imputed fraud on the law. And in 8 Mass. Rep. 299, Essex Turnpike Company v. Collins, the criterion of *237 liability was held to depend on this, “ whether there was any act done, by which the corporation was forced to accept the subscriber. If there was, this was a sufficient consideration . ... , . _ , . to bind him ; but if there was not this' obligation on the company, then he was not bound.” Here there was not only an obligation to admit the defendant, but he was actually admitted, — admitted at his own request, testified by the subscription. Nothing remained to be done by the Company, to give him an absolute right. I rest this opinion on the ground of there being no actual fraud, no conspiracy to evade the law ; that all the other subscribers have paid, their five dollars in advance; that this is the only omission, — the case of an individual able to pay, and not a man of straw, or a beggar, set up as a stockholder, to give a preponderance in the election of' managers to a particular interest. I take it as the case of one omission, where there has been no fraud, corruption, or collusion. How far this might form an exception, I will not at present say ; but I will say, in the words of Judge Yeates, in Shepherd et al. v. The Commonwealth, 1 Serg. & Rawle, 14, it would ill comport with the honour and dignity of the State, it would be manifestly unjust, under such circumstances, that the title of the plaintiffs should be deemed invalid, their charter void, on the ground of a supposed illegality in the bare omission or actual misconduct of the commissioners, in which the other subscribers could not, by possibility, have either agency or control. It would be inconsistent with good faith, for the State to interpose, to avoid the charter, if there was a Court in which the scire facias to .repeal the letters patent, on account of the Governor being deceived, would lie. But the State do not desire to avoid the charter, on the ground of the supposed fraud; for it would be directly contrary to the interests of the State to destroy any public road. The State do not complain, nor does any man complain of injury done to him, in person or in estate, by this omission. But it is desired indirectly, to declare it void, by one whose only complaint is, his own disobedience of - the law. This man cannot be heard against it; he is estopped by the acceptance of the letters patent.
The purity of the law is not to be vindicated, by rewarding the guilty and punishing those who do well: nor good *238 morals preserved, by holding out temptations to fraud ; nor does good policy require that the public interest should be destroyed — the public faith violated, because one man has been suffered to creep into this corporation by the window, when he ought to have paid his entrance money at the door. Nor is it with me a reason, to turn out of the house the subscribers who have honestly paid for their tickets, because the doorkeeper has given credit to one man for his ticket, when he should not have suffered him to enter without payment. The rule of law, as well as of morals, unquestionably is, that no one shall derive a benefit from a fraud practised by himself or others, to his own advantage. Neilson v. Mott, 2 Binn. 301. Neither public interest, nor public policy; nor regard for the public morals, demand such vengeance to be inflicted on the public themselves — no such sacrifice of innocent victims to appease the indignant spirit of a broken law. Nor can I believe that this doctrine of rewarding guilt and punishing innocence, will aid in the preservation of good morals. In addition to all this, there are many assignees of shares purchased on the faith of the government charter, in most of these turnpike companies ; yet so overwhelming is the doctrine, that all these rights are swept away, if at any time it should be discovered that there was one solitary subscriber who had not paid his entrance money previously to his admission as a member; and on an obligation given in consideration of stock transferred, the obligor, might set up this defect in one subscriber, as a defence to his bond. Such in my mind is the serious aspect which this case has assumed. The views I have taken of this subject, differ so widely in all respects from those taken by the majority of the Court — the consequences of the decision are so alarming, that I have thought it my duty to give somewhat at large, the reasons upon which my opinion is founded, and the causes of my dissent. They have satisfied my own judgment, and that must govern me. However mistaken and unsatisfactory they may appear to others, to me they are convincing. My opinion is, that the judgment is erroneous, and should be reversed ; but a majority of the Court thinking differently, it must be affirmed.
Judgment affirmed.

 For the English doctrine on this subject, see 2 Lev. 161. 2 Term. Rep. 22. 653.